A. D. PATCHIN, The, (GAGER v.)
[See Gager v. The A. D. Patchin, Case No. 5,170.]

A. D. PATCHIN, The (PATCHIN v.)
[See Patchin v. The A. D. Patchin, Case No. 10,794.]

---

## Case No. 88.

ADRIAN et al. v. The LIVE YANKEE.

[33 Hunt, Mer. Mag. 703.]

District Court, D. California.

SHIPPING—INJURIES TO GOODS—SWEAT—NEGLIGENCE.

[In an action against a vessel for damages to the cargo caused by moisture in the hold of the vessel, usually called "sweat," where it appears that the goods were stowed in the usual and proper manner, it will not be held negligence in the carrier to have failed to adopt a certain system of ventilation, the utility and efficacy of which as a preventive of a "sweat" is a matter of doubt and dispute.]

[In admiralty. Libel by Adrian and Story against the vessel Live Yankee on a contract of affreightment. Libel dismissed.]

HOFFMAN, District Judge. This was a libel on a contract of affreightment. The goods were shipped under the usual bill of lading, but on delivery were found to be saturated with moisture, and much damaged. It was proved that the goods were stowed in the usual and proper manner, but on the top of the between-decks cargo, and immediately under the upper deck, and that the damage was caused by moisture in the hold of the vessel, or what is usually called "sweat." On the general principle by which this cause must be determined this court has already expressed its opinion. In the case of Levy v. The Caroline, [Case No. 8,301.] it was considered that the carrier is not liable for damage arising from sweat, unless he is proved to have been guilty of negligence. That so far as relates to damage from this cause, all goods transported on voyages like that from the eastern states to this port must be considered perishable, or liable to injury, and the general rules with regard to perishable goods must be applied to them. That where damage is attributable to the intrinsic perishability of goods, the carrier is not liable, unless it appear that he has neglected to take proper care of them. These principles must, I think, govern this case. In the case of Camoys v. Scurr, 19 Car. & P. 383, which was an action against a carrier for damage to goods arising from their bad stowage, it was held that, if on the whole it be left in doubt what the cause of the injury was, or if it may as well be attributable to "perils of the sea" as to negligence, the plaintiff cannot recover. Lord Denman said, in summing up, that "the jury were to see clearly that the defendants were guilty of negligence, before they could find a verdict against them." Ang. Carr. § 212. In Cariss v. Johnson, in the New York superior court, 1848, Judge Oakley said: "I do not consider that common carriers are in all cases responsible for not delivering

property in a sound state. They are not warrantors that the property shall remain safe and sound. They are only warrantors for its safe delivery, and their further responsibility depends upon whether they use due care and diligence in carrying the property, or negligence can be proved against them by any omission to do what prudent men should do under such circumstances." Undoubtedly, when goods are given to a carrier in a sound state, and are damaged when delivered, the presumption of law is that it was by his negligence. But if he can show a peril of the sea sufficient to account for the injury, or a natural cause, such as the leakage, evaporation, or fermentation of liquids, or the rotting or decay of fruits, &c., the burden of proof will then be on the plaintiff to show actual negligence or defective means. If, in such a case, the proof leaves it doubtful what the cause of the injury was, or "unless the jury," in the words of Lord Denman, "see clearly that the defendants have been guilty of negligence," the plaintiff cannot recover. The degree of diligence to which, in respect of perishable goods, carriers are bound, is stated by Judge Oakley in the case already cited. Their responsibility depends upon whether they use due care and diligence in carrying the property; or negligence can be proved against them by any omission to do what prudent men should do under such circumstances.

In the case at bar, the injury is shown to have arisen from sweat or moisture collected in the hold during the voyage. It appears that sweat is incidental to all voyages around the Horn; that, in a greater or less degree, it almost invariably occurs; that it is a cause of damage well known to both shippers and ship owners, and that as yet no certain means have been devised to prevent it; that it is caused by the great variations in temperature necessarily occurring on such voyages; that it depends, in a great degree, upon the nature of the cargo, and is affected by other circumstances, the nature and operation of which are not clearly explained. It appears, therefore, that damage by sweat arises from natural causes independent of the agency of man, and that it is to be likened to the damage by fermentation, evaporation, spontaneous combustion, &c., which are all more or less owing to the heat or other conditions under which cargo is carried in ships, but for losses by which the carrier is not liable, unless negligence can be proved. The negligence attributable to the carrier in this case is alleged to consist in his not having provided sufficient ventilation for his ship. So far as his means extended, the master is shown to have used all diligence in ventilating the cargo. The hatches were frequently taken off, and everything was done which during a voyage could be done to preserve it. The ship was provided with one large ventilator, going down to the hold, and communicating with the between-decks by air-holes. She seems, in the opinion of some of the witnesses at least, to have been as well ventilated as ships ordinarily are; but her means of ventilation were inferior to those usually provided in clipper ships—the latter being generally furnished with one or two pairs of ventilators of Emerson's construction.

It is contended that the carrier was negligent in not having had more ventilators, or a system of ventilation such as that recently adopted in most clipper ships. The carrier in this case undoubtedly supposed that the ventilation provided by him was sufficient to secure all the good effects which may attend ventilation. The question is, has he been guilty of negligence in not having adopted a more thorough system? On the part of the claimants it is contended that the only preventive of sweat which has been suggested, is of extremely uncertain efficacy; that sweat frequently occurs in well ventilated ships, and that sometimes no traces of it are observed in the least ventilated vessels; that it depends more upon the nature of the cargo than upon any other circumstance; but that it is affected by causes the nature and mode of preventing the operation of which are not ascertained. In support of these allegations they have called many witnesses of the highest respectability, and possessed of the largest opportunities for observation. Some of them have not hesitated to declare that they considered the ventilation of ships, as commonly practiced, of no use whatever, or positively injurious.

On the other hand, the libelants have attempted to show by the testimony of an equal number of witnesses, that the sweating of ships can be, and is, prevented by the use of a thorough system of ventilation; that such a system has been generally adopted in the clipper ships of recent construction, and that its efficacy has been proved by the condition of the cargoes of several ships now or recently in port. They further showed that ventilation is required by Lloyd's agents in China, in ships taking cargoes of tea and silks, to prevent the effects of steam. It was suggested, however, that the steam thus intended to be prevented was a dry and noxious exhalation, impairing the flavor of teas and injuring the fabrics of silks, but was wholly distinct from sweat, which is condensed moisture collected on the lower side of the deck. This point, however, was not clearly established. Had the libelant in this case clearly established the general recognition of the fact that a particular system of ventilation will prevent damage by sweat, that that system is universally adopted and is usually effectual, he might claim that the master in omitting to adopt it had shown a want of ordinary diligence and care. But although he has shown that the clipper ships which frequent this port are usually ventilated in some way more or less thorough, he is met by the fact that cargoes are fre-

quently damaged in the best ventilated ships, and by the testimony of numerous witnesses, who express their disbelief in the efficacy of any system of ventilation whatever. Before the court can say that the omission of any particular means of preventing this damage is negligence in the master, it must be satisfied that those means are generally recognized as effectual. Does, then, the testimony establish this fact?

Whether or not ventilation is of any service, seems to be a mere matter of opinion, nor is it possible for the court, on the evidence, to come to any certain conclusion, whether the advocates or opponents of ventilation are in the right. The whole subject seems involved in doubt and obscurity, and the systems of ventilation that have been resorted to appear to have been adopted as experiments or attempts to remove the evil, rather than as a certain and ascertained means of preventing it.

It has been urged with great force by the advocate of the libelants that it is the duty of the court to exact from the carrier the employment of the latest inventions, and to demand that he keep pace with the last improvements in mechanical art; that by so doing the court will cherish, promote, and stimulate the application of science to the useful arts, and contribute to their growth and improvement. But the difficulty in this case is that it does not clearly appear that ventilation is an improvement. On the contrary, several witnesses, whose great experience entitles their opinions to much credit, affirm that in their own ships, and for their own cargoes, they would not adopt any system of ventilation whatever. Emerson's ventilators, the employment of which was most strongly insisted on by the advocate of the libelants, have been in use for the last five or six years. If they had been found so effectual a remedy as to justify the court in pronouncing the carrier who fails to adopt them guilty of negligence, is it credible that so many and so respectable persons connected with shipping would be found to disbelieve in that and all other systems of ventilation? The testimony brought to show a prevailing usage in this port, that the shipper bears a loss by sweat, though it failed to establish a usage in the legal sense of the term, proved this at least: that the general opinion of persons connected with commerce, shippers and ship owners, is that the ship is not liable. Surely such an opinion would would not prevail if there were any well-known, usually-adopted, and generally-recognized means of preventing sweat. And yet the court must find such to be the fact before it can declare this vessel to be liable. If it should be determined in this case that every vessel which is not provided with a ventilating apparatus is liable, the principle would include many ships which have avoided injuring their cargoes, though wholly unprovided with ventilation. In the case of The Thomas Watson, [Case No. 13,933,] for example, the rule would operate with peculiar hardship. That vessel, it appears, has made five voyages to this port, and has never damaged a single package, and yet she is not ventilated at all. Surely her owners are justified in assuming that ventilation in her case would be no improvement. If then, on her next voyage, some of her cargo is injured by sweat, her master would be held liable for negligence, under the principle the court is asked to adopt. With what propriety can the court call upon her owners to adopt a system which experience of their own ship has proved to be unnecessary, if not injurious; and how can it make a similar exaction of any of the numerous witnesses of intelligence and experience who profess their disbelief in the efficacy of all systems of ventilation? It may be said that ventilation may not be requisite in vessels of the size of the Thomas Watson, while in clipper ships to omit it would be improper. But this, after all, is but an opinion opposed by many of the most experienced witnesses, and affording no solid basis for the judgment of a court. Besides, in the uncertainty and obscurity in which this subject is involved, how can the court discriminate between vessels of various sizes? When is a vessel large enough to require ventilation? When is she small enough to dispense with it? Even the witnesses for the libelants, who are the strongest advocates for ventilation, confess that damage by sweat is of constant and daily occurrence; that few ships arrive whose cargoes are not more or less injured by it, and that a still more thorough system of ventilation is required. Could this be so if there did exist, as claimed by the libelants, any generally known and usually adopted remedy? If the ship owner is guilty of negligence in this case, for having failed to adopt a generally-recognized remedy for sweat, it should appear that cargoes can be, and usually are, protected by it—and yet the reverse is the fact. How can this remedy be said to be generally recognized as such when it fails so often as to leave the question as yet undetermined whether it is of any use whatever?

It is urged that the ship owners in this case have themselves recognized the expediency of ventilation by introducing it into their own ships, but that the means adopted by them were incomplete and insufficient. But the fact that they have tried what they no doubt considered a sufficient system of ventilation, at least shows that they were not reckless or indifferent on the subject, and the question still recurs—Are there any well-known and generally-recognized means of preventing this kind of damage which they have been guilty of negligence in omitting to use? If there had been any such, it is but fair to suppose they would have been adopted in the ship which the libelants in their letter to the master pronounce "a noble specimen of the merchant marine." It is to be observed that in the

very letter in which the libelants announce their intention to test the question of the ship's liability for damage by sweat, they make no complaint of insufficient ventilation, or suggest the use of more efficient means to that end. But they propose "the idea of experimenting upon the prevention of sweat by ceiling the between-decks overhead." They thus seem themselves to admit that no certain or established means of preventing this damage exist, and the remedy is suggested merely as an experiment.

On the whole, I consider that under the evidence in this case it does not appear that the damage has occurred from causes originating in the agency of man; nor that it could, like damage by rats, injuries by worms, etc., have been prevented by proper care; that the injury has arisen from natural causes, the effect of which the court cannot affirm the carrier could or ought to have guarded against; that it is not to be likened to the case of some unknown and internal defect in the particular vehicle of conveyance, for which the carrier is liable, but it is a risk to which every shipper knows his goods are liable, and which he also knows there are no ascertained and established means of preventing; that he is as competent as the carrier to determine which of the various modes of preventing it are most likely to insure the desired result; and that in shipping in this vessel he assumed the risk of her system of ventilation, as he would have assumed the risk of damage without any ventilation whatever had he shipped his goods in the Thomas Watson—and that, inasmuch as he knew the dangers to which his goods would be exposed, he might, had he chosen, have protected them by packing them in a different manner. But while I feel called upon so to determine in this case and with the present imperfect knowledge of this subject, it is not to be inferred that the same decision will always hereafter be made. On the contrary, if it should hereafter appear that science has suggested, or experience has shown, a remedy or preventive of damage from this source, which shall be generally recognized and adopted, it will be negligence in the carrier to omit its use. But as at present it cannot be said with any certainty that such a remedy has been discovered, I cannot find the carrier guilty of negligence in having failed to resort to one that has been suggested and used to some extent, but the utility or efficacy of which is still a matter of discussion and dispute.